DeCARLO, Judge.
Willie James McGhee, Jr., was indicted in January, 1975, by the Montgomery County Grand Jury for first degree murder. The indictment, omitting the formal parts, reads as follows:
“. . . The Grand Jury of said County charge that, before the finding of this indictment, WILLIE JAMES McGHEE, JR., whose name is to the Grand Jury otherwise unknown, unlawfully and with malice aforethought, perpetrated an act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life although without any preconceived purpose to deprive any par *118 ticular person of life, killed William Thomas Nix, by running a motor vehicle over, into or against a motor vehicle in which the said William Thomas Nix was a passenger, resulting in the death of the said William Thomas Nix, . . ..”
McGhee was tried and convicted and on appeal the judgment was reversed and the cause remanded.
On August 4th and 5th of 1976, he was retried and was sentenced to ten years for second degree murder.
This appeal is from that second degree murder conviction resulting from the second trial.
Prior to the second trial, in open court, but before the jury was qualified, the court informed the appellant as follows:
“THE COURT: You are charged with the second degree murder. How do you plead to that?
“MR. SMITH: Not guilty, Your Honor.
“THE COURT: You waive reading of the indictment?
“MR. SMITH: No, sir.
“THE COURT: You want reading of the indictment?
“MR. SMITH: Yes, sir.
“THE COURT: I’m not going to read it in the presence of the jury.”
After the jury was qualified and chosen, and were excused, the arraignment occurred:
“THE COURT: McGhee, you are charged with the offense of Murder in the Second Degree. To that charge, how do you plead?
“THE DEFENDANT: Not guilty.
“MR. SMITH: Not guilty.
“THE COURT: And you don’t waive reading of the indictment?
“MR. SMITH: No, sir.”
Subsequently, the following order was entered on record at the direction of the court:
“MR. TEAGUE: All right, sir; and the order entered on the docket sheet by the Honorable B. Embry, the Judge in this case, was the following: ‘The indictment charged the Defendant with First Degree Murder, and on trial, the Defendant was found guilty of Second Degree Murder, which by operation of law, is acquittal of the charge of First Degree Murder; which charge of First Degree Murder, the State dismisses, and proceeds on the Second Degree.’
“THE COURT: Now, to that charge, how do you plead?
“MR. SMITH: Not guilty.
“THE DEFENDANT: Not guilty.
“MR. TEAGUE: To the charge of Second Degree Murder?
“THE COURT: That’s right. All right, now, read the indictment.”
The indictment, at this point, was read to the defendant.
Counsel for the appellant demurred to the indictment, citing T. 14, § 314, Code of Alabama 1940, Recomp. 1958. He argued that the indictment charging appellant with the fourth class of murder in the first degree, did not embrace the lesser degrees of second degree murder and manslaughter.
Counsel stated that the appellant was being tried on the same indictment that he was previously tried on and found guilty of murder in the second degree, which was later reversed by the Court of Criminal Appeals. McGhee v. State, Ala.Cr.App., 333 So.2d 865.
The trial judge overruled the defense counsel’s demurrer to the indictment and the arraignment continued.
Following the arraignment, and further discussion among the court and attorneys, the jury was brought back into court and the trial continued.
The facts showed that Murray Sewell Hammond, a teacher at Hayneville High School, and a part-time employee at the Thrifty Service Station in Millbrook, Alabama, testified he had known the appellant for approximately four years. On December 24, 1974, the appellant came into the Thrifty Service Station and purchased a package of cigarettes and one can of beer.
According to Hammond, the appellant left the service station about six or six-thir *119 ty P. M., carrying the can of beer in a sack. He stated that the appellant did not appear to be drunk and did not stagger, have bloodshot eyes, or did he smell of alcohol. Hammond said McGhee left the station driving toward Montgomery in a Bonneville Pontiac.
James Alvin Nix was the father of the six-year-old victim, William Thomas Nix. He testified that on Christmas eve of 1974, around 6:00 P. M., he and his family were returning from Montgomery driving toward Millbrook in their 1974 Grand Torino Ford automobile. According to Mr. Nix:
“. . . we were traveling north toward Millbrook, and we got just about to the curve and started to the curve and saw an on-coming car, and it was off the road on its side; and I slowed down and pulled off the road and come just about stop, and the car was headed on toward me and so I speeded up and tried to avoid the car from hitting me, and I was unable to and the car hit me and knocking me off the road back on into the ditch.”
Nix said that at the time of the collision he was headed north on the right side of the road. He recalled that he was traveling approximately fifty miles per hour. His wife and small daughter were sitting in the front passenger seat while his two sons were seated in the back. The youngest, who was the victim in the collision, was seated just behind the driver’s seat and his brother was also seated in the rear next to him.
Mr. Nix testified that after the collision, his oldest son told him that the younger boy was hurt. Nix crawled over the front seat and found his youngest son lying halfway in the trunk on the passenger side of the car. According to Nix, the back seat was completely gone, “except the part you sit on.” He stated: “I checked his heartbeat and pulse and I couldn’t find any; and I picked him up, when I picked him up, I just stood straight up and walked out of the back of the car.”
On cross-examination, Nix stated that it had rained earlier but had stopped by the time the collision occurred. He said the first time he saw the appellant’s vehicle was when it was in the curve off the side of the road on the shoulder.
According to Nix:
“. . . there is a real sharp curve at the end of Tyler Goodwyn Bridge, a short straight-away, then another, and a small curve back to the left and right after that, that curve . . . Then there is another, a little small curve, then there is a straight-away all the way to the long curve where the collision happened.”
Nix said he had a discussion with the appellant following the collision. The appellant asked Nix, “What happened?” and he responded, “You knocked me off the road.” The appellant then countered, “Who knocked who off the road, you knocked me off the road.”
At the end of Mr. Nix’s testimony, the State, in the presence of the jury, read into the record the testimony of Dr. Neal Sen-zer, given at appellant’s first trial. The testimony was allowed, after the court had determined, at a hearing out of the presence of the jury, that the doctor was beyond the subpoena power of the State.
At the previous trial, Dr. Senzer had testified that he was working in the emergency room at a Montgomery hospital on December 24,1974. Dr. Senzer stated that he saw the Nix boy in the emergency room and that the boy was pulseless, that his eyes were dilated, that he (Dr. Senzer) could not auscultate or palpate a heartbeat, and that there was no breathing. His diagnosis at that time was that the child was dead on arrival.
W. H. Thompson, a State trooper with the Department of Public Safety, investigated the collision. Thompson said after arriving at the scene he made inquiries of two or three people as to “who was driving the Pontiac.” He subsequently found the appellant who said he was the driver. According to Thompson, he was using his flashlight and as he talked to the appellant he observed that his eyes were bloodshot and that he was “sort of unsteady on his feet.” Thompson stated it was his opinion *120 that the appellant had been drinking and there was an odor of alcohol on his breath.
He further testified that on his arrival he found a child, approximately six years old, lying on the ground with his father holding him.
Thompson stated that he had a conversation with the appellant and the appellant had said “that car ran me off the road.”
Thompson placed the appellant under arrest and took him to the Montgomery County Jail where a photo-electric-intoximeter examination was administered.
During the trial Thompson stated he was certified with the Department of Public Safety to administer the P.E.I. test. He said he followed the standard procedure laid out for the operation of the machine. Thompson testified that appellant, McGhee, had not had any alcohol from the time he saw McGhee at the collision scene until the test was administered around 7:40 P. M., an hour and ten minutes after the collision. The results of the P.E.I. tests indicated that McGhee had .17 alcohol content in his blood at the time of the test.
Corporal W. R. Applin of the State Department of Public Safety also investigated the collision on Christmas Eve of 1974. According to Applin, as he approached the scene he noticed two vehicles on the same side of the road about two hundred feet apart. Applin testified that he determined the point of impact and found paths of travel for each vehicle before and after the impact.
Further, Applin said there were approximately sixty-six feet of heavy skid marks leading off the pavement. He stated that the Nix vehicle could not have been completely on the pavement at the time of the impact. Applin explained that the rear wheel of the Nix vehicle at impact was at least three and one-half to four feet from the pavement edge.
Applin identified several photographs that were taken before the cars, involved in the collision, were moved by a wrecker. He said he found a brown paper sack, an empty jar, a package of Camel cigarettes, and two empty beer cans inside appellant’s car.
During cross-examination, Applin recalled that it had rained that day, but did not know whether it had rained in the vicinity of the Collision. He did state, however, that there was no fog at the approximate time of the collision.
Nelson Hodge Watts was employed by the State Department of Public Safety and worked in the driver improvement section as a field coordinator. He testified that, as a field coordinator, part of his duties were to check the photo-electric-intoximeter machines and to determine whether or not they were in proper working order. According to Watts, he checked the photo-electric-intoximeter machine No. 234 at the Montgomery County Jail on December 18, 1974. He stated that the P.E.I. machines were checked every thirty days.
Watts identified a log which he kept in conjunction with his inspections of the photo-electric-intoximeter machines and stated that machine number 234 was the machine used to examine Willie James McGhee.
Watts said a person is considered legally intoxicated under the law in the State of Alabama when the reading on the P.E.I. machine indicates .10 or above.
E. F. Dixon, a captain in the enforcement division of the Department of Public Safety, testified that in 1974 he “headed up” the breath-testing unit for the department. He stated that on November 10, 1974, and on January 9, 1975, he inspected the machine in question and each time found it to be accurate.
According to Robert Finley, technical director of chemical testing for the intoxication program of the Department of Public Health, it was part of his duties not only to oversee the photo-electric-intoximeter tests but to check the machines and to certify those eligible to administer the tests. Finley stated that Capt. Dixon and Trooper Thompson were both certified by the Department of Public Health.
Finley testified as to the standards laid down by the Department of Public Health regarding the administration of the intox- *121 imeter test, and also explained the meaning of the various readings.
Junior Roscoe Walls was employed as a wrecker driver and testified that on the evening of December 24, 1974, he went to the scene of a collision on Highway 143, north of Montgomery, and towed the appellant’s car to his house. According to Walls, while enroute he had to stop and get out of the truck. When he did so he observed about eight to fifteen empty beer cans under the front seat of appellant’s car.
Mr. Nix was recalled by the State and testified that he had observed McGhee from the time he first saw him and that he “was driving well above the speed limit; because I could hear rocks and things from the car and he had to be traveling above the speed limit.”
At the conclusion of Mr. Nix’s testimony, the State rested its case and the defendant made a motion to exclude the State’s evidence on the ground that the State had failed to “produce three elements that are necessary, — willful, deliberate, and malicious.” The court overruled the motion and the defense called the appellant, Willie James McGhee, Jr.
McGhee recalled that on Christmas Eve morning of 1974, he got up around 8:00 o’clock, and, after working in his yard, went with his wife to Prattville to purchase some fruit. Upon his return around noon, he sat around the house, then went to his church to cover a water line. From there he went to his parent’s home to deliver Christmas presents. He said during that time he did not have anything to drink.
He went back to the church and remained there until he went to the service station where Mr. Hammond worked. According to McGhee, it was around 6:00 P. M. when he went to the service station, and that he stayed there about fifteen or twenty minutes, and purchased a package of cigarettes and a can of beer.
McGhee said he left the service station headed toward Montgomery on Highway 143, driving approximately fifty to fifty-five miles per hour. He said the weather was kind of foggy and steam was coming off the pavement.
According to McGhee, just prior to entering a curve, he pulled off the highway to avoid a car that he was meeting head on. He said it was when he got back on the road that he saw Nix car coming around the curve. McGhee went on to say:
“. . . and so when I got back on the road, I discovered Mr. Nix coming around the curve, he was on the yellow line so I got my car off of his front and caught it right across the back.”
McGhee denied telling a trooper that Mr. Nix had run him off the road. He said the impact had knocked him out but after the collision he had walked over to Mr. Nix and asked if he could help him. A few minutes later a State trooper arrived and he asked McGhee if he had been driving one of the cars involved. McGhee responded that he had been. Subsequently, the officer handcuffed McGhee and placed him in the patrol car.
McGhee said he was carried to jail and given a test. He testified that at the end of the test the officer took him to St. Margaret’s Hospital.
McGhee denied being intoxicated at the time of the accident and said he had had just one beer the entire day.
During cross-examination, McGhee testified that his brother had used his automobile and could have possibly left the empty beer cans in his car. Further, he said he could not account for the amount of alcohol content in his blood but said he had only consumed one beer.
I
As stated earlier, appellant argues that it was error for the trial court to overrule his demurrer to the indictment entered against him. He states the indictment could not include the lesser offense of second degree murder and that there should have been a reindictment for second degree murder. Further, counsel contends it was error to allow the indictment to go to the jury bearing the words: “Depraved mind, regardless *122 of human life although without any preconceived purpose to deprive any particular person of life.”
It has long been the rule that an indictment for first degree murder includes every lesser degree of homicide including second degree murder. Linehan v. State, 120 Ala. 293, 25 So. 6; Helms v. State, 22 Ala.App. 459, 116 So. 808; Echols v. State, 276 Ala. 489, 164 So.2d 486. The indictment in the present case was for first degree murder of the fourth class. There should be no distinction made between this class and the other three as to whether or not lesser degrees of homicide come under the umbrella of a first degree murder. See Langford v. State, Ala., 354 So.2d 313. Therefore, there was no merit to the demurrer as it applied to this argument.
It is not uncommon for an accused to be retried after a reversal on the same indictment, although he was previously convicted of a lesser included offense. Ferguson v. State, 141 Ala. 20, 37 So. 448.
We note from the record that the jury was instructed that the appellant was being tried for second degree murder and they were thoroughly instructed on all degrees of homicide. Further, the judge also instructed the jury that the indictment in the case was not to be considered in any way as evidence or shedding light whatsoever upon the guilt or innocence of the defendant.
Under these circumstances, it is our judgment that the wording in the indictment did not prejudice the defendant and, for this reason also, the demurrer should have been overruled.
II
McGhee next contends the trial court erred in admitting the results of the P.E.I. test in that the State had not established that he did not have access to intoxicating beverages between the time of the accident and the time he was confronted by a State trooper.
In Montgomery v. State, 44 Ala.App. 129, 203 So.2d 695, this court stated:
“It is permissible to show by a late arriving witness the defendant was drunk in his presence, providing the State also shows that the surrounding circumstances are as such as to preclude the possibility of appellant drinking after the accident.”
In the present case the period of time elapsing from the time of the collision and the arrival of the State trooper was approximately twenty minutes. McGhee’s actions during this interval of time were accounted for by Mr. Nix. He said he had seen McGhee immediately after the collision and had spoken to him shortly thereafter. Additionally, the accident was of such a severity that a judge could reasonably conclude from these facts that the appellant did not have access to alcoholic beverages.
Ill
Thirdly, the appellant maintains the trial court erred in allowing a witness to testify as to the whereabouts of an absent witness who had testified at appellant’s first trial on the same charges. Counsel argues that such testimony was hearsay and was erroneously admitted.
This contention is centered around the fact that Dr. Neal Senzer’s absence from the State was established through the testimony of Stephen J. Siegel, a special agent with the Air Force Officer’s Special Investigations at Maxwell Air Force Base.
Siegel testified, outside the presence of the jury, that he was familiar with people discharged from Maxwell Air Force Base. He said Dr. Neal Senzer, who was at Maxwell on December 24, 1974, had been discharged from the Air Force and currently resided in North Woodmere, Nassau County, New York.
During cross-examination, after Mr. Sie-gel acknowledged that he was not in charge of the personnel records, defense counsel objected to his testimony on the grounds that it was based on hearsay. The objection was overruled and Dr. Senzer’s testimony at the previous trial was allowed to be read to the jury.
*123 We have read Dr. Senzer’s testimony and it was substantially nothing more than a statement that the Nix boy was dead on arrival at the emergency room.
The fact concerning the victim’s death was also testified to by the father, Mr. Nix, and Officer Thompson during the State’s case in chief. Each testified that the child was dead after the accident. See Parker v. State, 51 Ala.App. 362, 285 So.2d 526, cert. den. 291 Ala. 795, 285 So.2d 529.
Due to the fact that counsel had ample opportunity to cross-examine Dr. Senzer, we find no error in admitting his testimony to be read to the jury. At best, it was merely cumulative of what other witnesses had already said. See Rule 45, Alabama Rules of Appellate Procedure.
No error appearing in the record, the judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.